Jonathan WADLEIGH, et al., Plaintiffs,

v.

RHONE–POULENC RORER, INC., Armour Pharmaceutical Company, Inc., Miles, Inc., Baxter Healthcare Corporation, Alpha Therapeutic Corporation, and National Hemophilia Foundation, Defendants.

No. 93 C 5969.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 17, 1994.

David S. Shrager, Shrager, McDaid, Loftus, Flum & Spivey, Dianne M. Nast, Kohn, Nast & Graf, P.C., Philadelphia, PA, Eric Howard Weinberg, New Brunswick, NJ, Martin H. Levin, Fredric G. Levin, Ross M. Goodman, H. Clay Mitchell, James R. Green, Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, FL, Robert E. Turffs, Kanetsky, Moore & DeBoer, P.A., Venice, FL, for Jonathan Wadleigh.

Leonard M. Ring, Debra Ann Thomas, Leonard M. Ring & Associates, Chicago, IL, David S. Shrager, Shrager, McDaid, Loftus, Flum & Spivey, Dianne M. Nast, Kohn, Nast & Graf, P.C., Philadelphia, PA, Eric Howard Weinberg, New Brunswick, N.J., Martin H. Levin, Fredric G. Levin, Ross M. Goodman, H. Clay Mitchell, James R. Green, Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, FL, Robert E. Turffs, Kanetsky, Moore & DeBoer, P.A., Venice, FL, for Joanne Wadleigh, Dana Kuhn, Thomas Fahey, Frances Fahey, Joseph Walker, Rachel Walker, Walter Erickson, Maria Erickson, Susan Collins, Jack Stevens, Linda Stevens, Larry Burr, Juanita Burr, Samuel Thomas, Joanne Thomas, Charles Turner, Constance Turner, Linda Lewis, Jerry L. Lewis and Martha Dougherty.

Gerald L. Angst, Douglas F. Fuson, Sara J. Gourley, Sidley & Austin, Chicago, IL, for Rhone–Poulenc Rorer, Inc., Armour Pharmaceutical Co., Inc.

Pamela L. Gellen, Johnson & Bell, Ltd., Chicago, IL, for Miles, Inc.

Charles Gregory Albert, Allison L. Wood, Albert, Bates, Whitehead & McGaugh, Chicago, IL, for Baxter Healthcare Corp.

Anne Giddings Kimball, Martha D. Owens, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Alpha Therapeutic Corp.

Mark Caldwell Meyer, Roger K. O'Reilly, James L. DeAno, Maura Susanne Weidner, O'Reilly, Cunningham, Norton & Mancini, Wheaton, IL, for Nat. Hemophilia Foundation.

### MEMORANDUM OPINION

GRADY, District Judge.

This opinion addresses plaintiffs' motion for class certification. The named plaintiffs in this diversity case are persons suffering from hemophilia and the spouses, guardians and personal representatives of persons who suffer or have suffered from the disease. Hemophilia is a hereditary bleeding disorder in males caused by an insufficiency of certain proteins in the blood which are necessary for coagulation to occur. These proteins are referred to as "Factor VIII" and "Factor IX." According to the complaint, some 20,000 persons in the United States have hemophilia. The primary risk of the disease is bleeding, spontaneously or as a result of trauma, into joints, muscles, or body cavities.

At one time, hemophiliacs were treated by transfusions of plasma or whole blood. This required hospitalization and was largely ineffective because plasma and whole blood contain low levels of Factor VIII and IX. More effective methods were sought, and, by the late 1960s, it had become possible to extract Factor VIII and Factor IX from the blood of donors, concentrate it, and infuse the he-

mophiliac with the concentrate, known as antihemophilic factor concentrate ("AHF").[1] The concentrate was far more effective in bringing about clotting and it was more convenient as well, inasmuch as no hospitalization was required and the patient could self-inject.

Four of the defendants in this case are manufacturers who extract Factors VIII and IX from donated blood, process it into AHF and distribute the AHF for use by persons with hemophilia. The manufacturing process is known as "fractionating," and these defendants are referred to as "fractionators." The remaining defendant in the case is the National Hemophilia Foundation ("Foundation"), a not-for-profit association organized to advance the interests of the hemophilia community.

The basis of the suit is plaintiffs' claim that as a result of using the defendant fractionators' concentrates they (or their spouses, wards, or decedents) became infected with the Human Immunodeficiency Virus ("HIV") virus. This is the virus that causes Acquired Immune Deficiency Syndrome ("AIDS"), a disease that, over time, destroys the body's immune system and ultimately results in death. Some of the plaintiffs allege that they have contracted the virus, some allege that they have developed AIDS, and others allege that their decedents have died from AIDS-related complications.

The core of plaintiffs' negligence claim is that the fractionators knew in the 1970s that viruses which cause various diseases, such as hepatitis, were blood-borne, and therefore the fractionators should have taken precautions to prevent or at least reduce viral contamination of their products. Instead, plaintiffs allege, the fractionators used plasma collected from paid donors, a group they should have known included many persons at high risk for viral infection, such as intravenous drug users. A major allegation of negligence is that the defendants failed to use available technology to sterilize their AHF products despite their knowledge that a large percentage of patients who use the products

were being infected with hepatitis and other serious viral diseases.

The complaint goes on to allege that when the condition now known as AIDS was first reported in 1980, the manufacturers should soon thereafter have known that the disease was blood-borne and could be transmitted by their AHF products. Despite this known risk, the defendants continued to use pooled plasma from paid donors, failed to screen the donors to identify and exclude persons likely to be HIV-positive, failed to take steps to sterilize their products, and failed to warn the hemophilia community of the danger of contracting AIDS from the use of their products. Instead, plaintiffs allege, the fractionators gave false assurances of the safety of their products which they knew would be relied upon by hemophilia patients and their treating physicians. Plaintiffs allege that the defendant Foundation, influenced by the financial contributions it received from the fractionators, gave similar unfounded assurances of the safety of the fractionators' products, knowing that the hemophilia patients and their treating physicians would rely on those assurances.

Plaintiffs allege that more than half of the 20,000 persons with hemophilia in the United States have become infected with the HIV virus and that about 2,000 persons with hemophilia had died from AIDS by the time the complaint in this case was filed in September of 1993.

The complaint contains counts charging the fractionators with negligence, strict products liability, breach of implied warranty and conspiracy and a count charging the defendant Foundation with negligence and breach of fiduciary duty. Compensatory and punitive damages are sought against all defendants.

### DISCUSSION

In seeking class certification, plaintiffs assert they have met all requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure. In the alternative, plaintiffs ar-

---

1. Plaintiffs and the defendants disagree as to whether it is accurate to refer to Factor IX concentrate as AHF, but that question is not material to the class certification issues discussed in this opinion.

gue that particular issues should be certified for class treatment pursuant to Rule 23(c)(4). Defendants contend that none of the Rule 23 requirements are met and oppose any form of certification. What follows is a discussion of the opposing arguments concerning compliance with the various requirements of the rule.

### Numerosity

■ Rule 23(a)(1) provides that a class action can be maintained only if "the class is so numerous that joinder of all members is impracticable...." As noted above, plaintiffs estimate that there are some 20,000 persons in the United States who have hemophilia and that as many as half of them may be infected with the HIV virus, usually as a result of using one or more of the defendants' concentrates. Plaintiffs argue that it would not be feasible for each of the affected persons to file a separate suit, owing in part to the substantial litigation costs required to prosecute a claim involving complex scientific issues. It is this financial consideration, along with the reluctance of many HIV-infected hemophiliacs to make a public disclosure of their condition, that, according to plaintiffs, accounts for the fact that no more than about 300 cases have been filed nationwide. Defendants respond that there is no financial impediment to filing suit, since cases of this kind are typically handled by lawyers on a contingent fee basis. Moreover, defendants challenge the suggestion that embarrassment is a deterrent to filing suit; the more likely explanation for the relatively low number of filings, according to defendants, is the realization among the hemophiliac community that there is no basis for any claim against the defendants.

On the numerosity question, as well as other issues discussed in this opinion, this court has an advantage that a trial judge ruling on a class certification motion usually does not have. It has the advantage of having presided over a trial involving the same subject matter. The case of *Poole v. Alpha*, No. 86 C 7623 (N.D.Ill.), was tried to a jury in this court in 1993. Stephen Poole was a hemophiliac who became infected with the HIV virus as a result of using Factor VIII concentrate and eventually died of AIDS, leaving a widow and children surviving. Poole's estate sued the same four fractionators named as defendants in this case, alleging that Poole had used each of their concentrates. The claims and defenses were substantially identical to those that appear to be presented in this case. Expert witnesses testified on both sides concerning the questions of negligence and proximate cause. After 5½ weeks of trial, the jury returned a special verdict finding that "none of the defendants was negligent in any of the ways charged by the plaintiff." Judgment was entered for the defendants, and the case is now on appeal to the Seventh Circuit.

■ The trial of the *Poole* case was enormously expensive for both sides, and it is unlikely in the extreme that every member of the proposed class in this case would be able to fund a separate action of that kind, even with attorneys working on a contingent fee basis. Expert witness fees alone would run into the tens of thousands of dollars. But aside from the matter of expense, the more specific question under Rule 23(a)(1) is whether the class is so numerous that *joinder* of all members is impracticable. And whether the class consists of hundreds of persons, as defendants argue, or thousands, as plaintiffs say, the number is obviously too large to join as plaintiffs in this one action. Although the rule mentions only the number of class members—thus the shorthand "numerosity" for the rule 23(a)(1) requirement—it is clear that the number is to be considered in connection with all of the relevant circumstances bearing upon the practicability of joinder. *See, e.g., Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981):

> The basic question is practicability of joinder, not number of interested persons per se. Practicability of joinder depends on size of class, ease of identifying its members and determining their addresses, facility of making service on them if joined and their geographic dispersion. (citation omitted)

In this case, the members of the putative class are alleged to be dispersed throughout the fifty states and the District of Columbia. Their identities are for the most part un-

known to the named plaintiffs. Some of the class members may be unaware of their HIV infection. To the extent there is merit to plaintiffs' allegations that the defendants have misled the hemophilia community concerning the safety of factor concentrates, class members may be unaware of the alleged connection between concentrates and transmission of HIV. "For purposes of determining class certification, the allegations are taken as true and the merits of the complaint are not examined." *Allen v. Isaac,* 99 F.R.D. 45, 49 (N.D.Ill.1983) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974)). It is not, of course, necessary that joinder of all class members be impossible. As the Seventh Circuit has stated, Rule 23 should be construed to permit a class action where the class is " 'so numerous that their voluntarily, unanimously joining in a suit is concededly improbable and impracticable.' " *Hohmann v. Packard Instrument Co.,* 399 F.2d 711, 715 (7th Cir.1968) (quoting *Weeks v. Bareco Oil Co.,* 125 F.2d 84, 88 (7th Cir. 1941)). Moreover, the numerosity requirement is met unless it is practicable to join *all* members of the class. Here, with many members of the class not even identified, there is no plausible argument that it is practicable to join all of them at this time. *See Jack v. American Linen Supply Co.,* 498 F.2d 122, 124 (5th Cir.1974) ("[J]oinder of unknown individuals is certainly impracticable. Thus the requirements of Rule 23(a)(1) would appear to be met here."). And nothing in the rule suggests that class certification should await exhaustion of all efforts to identify every class member; on the contrary, Rule 23(c)(1) requires that the court rule on class certification "[a]s soon as practicable after the commencement of an action brought as a class action...."

Plaintiffs have satisfied the numerosity requirement.

### Common Questions of Law or Fact.

■ The next prerequisite for a class action is the requirement of Rule 23(a)(2) that there be "questions of law or fact common to the class...." The fractionator defendants do not argue that there are no common questions of law or fact but make a variety of arguments as to why common questions do not "predominate over any questions affecting only individual members," a requirement of Rule 23(b)(3). The defendant Foundation, however, argues that there are no questions of law or fact that are common both to it and the fractionator defendants. The Foundation contends that the determination of whether it was negligent will be based on facts it knew or reasonably should have known, whereas the facts known to the fractionators may have been different. While this may be true to an extent, it is also true that one of the principal factual questions in the case will be the state of scientific knowledge at various relevant times concerning the likelihood of transmission of virus by the factor concentrates and what could be done to prevent it. Much of that knowledge was disseminated through scientific journals available to all of the defendants. What the defendant Foundation should have known, and when it should have known it, will be determined by what was reasonably inferable from the available data at various points in time. That inquiry will be the same whether the defendant under consideration be a fractionator or the Foundation. According to the complaint, the Foundation was privy to much of the same information available to the fractionators. The jury might reach different conclusions as among the various defendants, but this does not indicate the absence of a common question.

The fiduciary questions pertain only to the Foundation, but proof of a breach of any fiduciary obligation will depend largely on the common question of what was known in the scientific community at the relevant times. Plaintiffs' argument will be that if the Foundation ignored or misrepresented the danger of infection associated with the concentrates, it violated its obligations to the members of the hemophilia community who relied upon its advice or its failure to warn.

The common question requirement of Rule 23(a)(2) is satisfied.[2]

---

**2.** If it were true that the common questions between plaintiffs and the fractionator defendants were different from the common questions between plaintiffs and the Foundation, this would

## Typicality

The third prerequisite is that "the claims or defenses of the representative parties are typical of the class or defenses of the class...." Rule 23(a)(3). Defendants argue that the claim of each class member is unique in the severity of his hemophilia, the nature of the medical treatment received, the identity and quantity of factor concentrate used, the manner and date of HIV infection, and various other circumstances affecting both liability and damage issues. Therefore argue the defendants, no class member's claim is "typical" and no class action can be maintained.

■ The typicality requirement of the rule overlaps other requirements designed to ensure that the class representative will fairly and adequately prosecute the claims of the absent class members. It is thus related to the common question requirement just discussed as well as to the fair representation requirement of Rule 23(a)(4), discussed below. 7 A. Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1764. Fair and adequate representation does not require that the claims of the representative and the absent members be factually identical. That would usually be impossible. The typicality requirement is satisfied if the claims and legal theories of the class representative are the same as those of the absent class members, even though factual distinctions may exist:

> A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.... The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control in the face of differences of fact.

*De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (citations omitted). *See also Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir.1993).

■ The complaint in this case alleges that all members of the class were injured as a result of the defendant fractionators' negligence in the collection of blood plasma from high-risk donors, their failure to use available methods to de-activate virus in their concentrates, and their sale of contaminated product, without warning of the danger, for use by the class members. The defendant Foundation is charged along with the fractionators with negligent failure to warn class members of the danger involved in the use of the fractionators' products. The claims of all class members are the same, and their legal theories are the same.

The typicality requirement of Rule 23(a)(3) is satisfied.

## Adequacy of Representation

■ The final prerequisite is the requirement of Rule 23(a)(4) that "the representative parties will fairly and adequately protect the interests of the class." Defendants again point to the factual differences noted in the foregoing discussion of the typicality requirement. Their argument that these differences impair the ability of the named plaintiffs to represent the class is no more persuasive here. Defendants suggest that class representatives who use only Factor VIII would have no interest in making a case in regard to Factor IX and that plaintiffs who used the concentrate of one fractionator would have no interest in making a case against any other fractionator. The short answer to this, however, is that according to the complaint, there is at least one class representative for each base that needs to be covered.

Finally, defendants suggest that plaintiffs' failure to join additional defendants, such as health-care providers, indicates a lack of zeal to protect the interests of the class. The court is not in a position to second-guess the strategy of plaintiffs in their selection of defendants. Certainly nothing on the face of the complaint indicates an obvious error in that strategy. The court does note that plaintiffs' counsel in this case are experienced in Factor VIII and Factor IX concen-

---

not mean that there should be no class certification. It would simply mean that there are two class actions rather than one, or that there

should be a severance for trial purposes. *See* Rule 42(b), Fed.R.Civ.P.

trate litigation and in fact have been appointed by this court to the plaintiffs' steering committee in the Multi–District Litigation which has been centralized in this court for consolidated pretrial proceedings. *In Re Factor VIII and Factor IX Concentrate Litigation,* MDL–986.

The court concludes that the named plaintiffs will adequately represent the class.

### Rule 23(b)(3) Considerations

■ In addition to fulfilling the prerequisites of Rule 23(a), plaintiffs must satisfy the requirements of Rule 23(b)(3)

> that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The court's finding that there are common questions of law and fact sufficient to meet the requirement of Rule 23(a)(2) is not the same thing as a finding that those questions predominate over those that affect only individual members of the class.

Plaintiffs emphasize that the defendant fractionators have engaged in essentially similar conduct in regard to their collection of plasma and the manufacture and sale of their concentrates. A major common issue is whether that conduct was negligent in the various respects alleged by plaintiffs. Plaintiffs point out that they have all been injured in essentially the same way, by contracting HIV from the concentrates, and they minimize any problem associated with the proof of proximate cause in the individual case.

Defendants, on the other hand, emphasize that there were differences in their collection and manufacturing procedures, so that a common determination of negligence would be impossible. The court is not persuaded by this argument, because the point, at least as far as ordinary negligence is concerned, is not what particular procedures the defendants used but whether they failed to take precautions that plaintiffs allege would have been taken by reasonably careful fractionators, specifically, the screening of donors and the sterilization of the concentrates. Should a jury determine that the failure to take these measures was negligence, then, regardless of what procedures a particular fractionator did use, it could be found negligent on the same basis as any other fractionator found guilty of the same omissions.

■ Defendants argue that there can be no common question of negligence because the rights of the individual class members would be determined according to the law of their state of residence (presumably the place where the injury occurred); the negligence law of each of fifty-one jurisdictions would have to be applied by the jury, making a joint trial impossible.

Defendants are accurate in pointing out that the negligence law of the various states is not uniform in regard to the *duty* it imposes upon a defendant in cases of this kind. According to one writer, most jurisdictions would hold a fractionator only to a "professional standard of care," which means that the plaintiff would have to prove that the conduct of the fractionator departed from what other fractionators were doing at the time. Joseph Kelly, *The Liability of Blood Banks and Manufacturers of Clotting Products to Recipients of HIV–Infected Blood: A Comparison of the Law and Reaction in the United States, Canada, Great Britain, Ireland, and Australia.* 27 J. Marshall L.Rev. 465, 472–73 (1994). The "professional standard of care" rule has a curious history, described in an interesting article by Professor Theodore Silver, *One Hundred Years of Harmful Error: The Historical Jurisprudence of Medical Malpractice,* 1992 Wis. L.Rev. 1193. The author explains how physicians were originally held to a standard of ordinary care, just like everyone else. They were required to possess the degree of skill that was ordinarily possessed by other physicians and to *exercise* reasonable care in treating patients. Confusion began with the Illinois case of *Ritchey v. West,* 23 Ill. 329 (1860), where the court, giving no indication that it intended to announce a new rule, stated that a physician was required to "possess and *exercise* that degree of skill which is ordinarily possessed by members of the profession," *id.* at 330 (emphasis added), thus conflating the required skill and the required

degree of care. Silver, *supra*, at 1222–25. Eventually, most courts, without seeming to realize they were changing the law, began to express the duty in terms of "professional custom" (more often now referred to as "professional standard of care"), which Silver criticizes as senselessly indulgent:

> With professional custom as the standard, the nation's physicians may lawfully adopt and follow practices that are patently negligent and unreasonable under the standard of ordinary care to which all others are held. The medical community is answerable not for want of care but for want of conformity. It is thus recognized that the medical profession has the curious advantage of establishing, on its own, the standard of care to which it is legally obliged.

*Id.* at 1213. Various justifications have been offered for the rule, but they seem unpersuasive. *Id.* at 1214–19. It is not easy to understand what basis there is for extending the benefit of the rule to commercial suppliers of blood products, such as the defendants in this case. A few courts have held fractionators to a duty of ordinary care. Kelly, *supra*, at 474–76. This court, applying what it believed to be Illinois law, instructed the jury in *Poole v. Alpha* that defendants were required to use reasonable care, and that

> [w]hen I use the words "reasonable care," I mean the care that would be used by reasonably careful collectors of blood or plasma and processors of Factor VIII concentrate under circumstances similar to those shown by the evidence at and prior to the time Stephen Poole contracted the HIV virus. The law does not say how reasonably careful collectors of blood or plasma and processors of Factor VIII concentrate would act under those circumstances. That is for you to decide.
>
> In determining whether any defendant exercised reasonable care under the circumstances you may consider:

> a. the state of medical and scientific knowledge available at and prior to the time Stephen Poole became infected with HIV;
>
> b. the Food and Drug Administration's regulations governing licensing, manufacturing methods, and labeling; and
>
> c. the practices and procedures of collectors of blood or plasma and processors of Factor VIII concentrate at and prior to the time Stephen Poole became infected with HIV.

In this view, the conduct of other fractionators is relevant but not conclusive on the question of negligence. *See* Silver, *supra*, at 1241; *Darling v. Charleston Community Memorial Hosp.*, 33 Ill.2d 326, 211 N.E.2d 253, 257, 261 (1965).

Defendants assert repeatedly in their briefs that negligence law differs from state to state, but the only difference they specifically identify is the distinction between ordinary negligence and professional standard of care. They give no examples of differing definitions of ordinary negligence. It is this court's impression that the definition of ordinary negligence is substantially identical in all jurisdictions. In Illinois, for instance, it is defined as "the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence."[3] IPI, Civil, 10.01. This is not materially different from the definition in the Restatement:

> Unless the actor is a child, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances.

Restatement (Second) of Torts, § 283 (1977). Counsel for the fractionator defendants in this case were trial counsel in *Poole*, and they have not made any attempt to show that the Illinois definition is materially different from that of any other state. The court

---

**3.** In the trial of *Poole v. Alpha*, the jury was given the following instruction:

> When I use the word "negligence" in these instructions, I mean the failure to do something which a reasonably careful fractionator would do, or the doing of something which a reasonably careful fractionator would not do, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful fractionator would act under the circumstances. That is for you to decide.

presumes their research has been exhaustive and is content for present purposes with the assumption that, as far as ordinary negligence is concerned, no individualized issues are created by the fact that the claims of the various class members arose in a multiplicity of jurisdictions.

■ Defendants argue with particular vigor that the law concerning foreseeability of injury will differ among the various jurisdictions. Plaintiffs' complaint emphasizes the fractionators' knowledge as early as the 1970s that blood carries virus and that the Hepatitis B virus was in fact transmitted by blood and blood products. It is further alleged that defendants knew that new viruses could appear at any time. Finally, it is alleged that defendants knew that heat kills viruses. It is plaintiffs' theory that this knowledge imposed upon the fractionators a duty to sterilize their products to protect against transmission of any harmful virus, known or unknown. This allegation is designed to get around the fact that the AIDS virus was not discovered until the early 1980s, by which time a substantial portion of the hemophilia population had already become infected with it. Defendants argue that this effort by plaintiffs to impose a duty on them to protect against unknown hazards would require application of the law of each state. This is simply a variant of defendants' argument that there are differences in the negligence law of the various states. But the defendants have cited no case law from any state pertinent to the question of whether a defendant has a duty to guard against unknown but allegedly foreseeable risks. This court believes the general rule would be that there is such a duty. The question is not whether the particular risk is known, but whether it is of a kind that was foreseeable to the defendant. In the *Poole* trial, the jury was given the following instruction:

The defendants had no duty to protect against injuries that were not reasonably foreseeable. On the other hand, it is not necessary for plaintiff to prove that the defendants could have foreseen the HIV virus itself. In determining whether any of the defendants were negligent, you should evaluate that defendant's conduct in light of what was reasonably foreseeable at the time of the defendant's claimed acts or omissions.

If, in the time that has elapsed since the *Poole* trial, counsel for the fractionators had found case law from any jurisdiction which conflicts with the sense of that instruction, they would have cited it. In the absence of such case authority, the court is satisfied that every jurisdiction would follow the rule suggested in § 435 of Restatement (Second) of Torts.

Foreseeability of Harm or Manner of Its Occurrence

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.[4]

As far as plaintiffs' negligence claims are concerned, then, there do not appear to be any individual issues, arising out of either the peculiar circumstances of an individual plaintiff or differences in state law, that would predominate over the common issues. The fact that the defendants might be subject to different duties in different jurisdictions—customary or professional standard in some

---

4. Comment "a" of § 435 explains:
   a. The fact that the actor, at the time of his negligent conduct, neither realized nor should have realized that it might cause harm to another of the particular kind or in the particular manner in which the harm has in fact occurred, is not of itself sufficient to prevent him from being liable for the other's harm if his conduct was negligent toward the other and was a substantial factor in bringing about the harm. However, the manner in which the harm occurs may involve the cooperation of other assisting factors so numerous and so important that the actor's negligence cannot be regarded as a substantial factor in bringing about the harm. (See § 433, Clause (a).)

and ordinary care in others—does not create a multiplicity of individual issues. The fact questions as to what was known in the relevant scientific community at various times, and the efficacy of what the fractionators were doing at various times, are common.

Separate problems are presented by the claims based on strict products liability and breach of implied warranty. The defendants have filed motions to dismiss these counts of the complaint on the ground that the "blood shield" statutes and case law of all states protect the manufacturers or distributors of blood products from strict products liability or liability based on breach of implied warranty.[5] The court has not ruled on these motions, because the class certification motion should be decided first. *Koch v. Stanard,* 962 F.2d 605, 607 (7th Cir.1992). If the motions are granted, that will moot any question as to whether individual issues predominate in these claims. But even if the motions are denied, the court believes that individual issues do in fact predominate and that strict liability and breach of implied warranty are therefore inappropriate subjects for class treatment. See discussion at pp. 426–27, *infra.*

All that is likely to remain against the fractionators, then, is a straight negligence case. And if plaintiffs' entitlement to relief depended simply upon proof of negligence, there would be little impediment to certification of the entire liability case as a class action. But, of course, more is required. Before any member of the class would be entitled to damages, there must be proof of a causal relationship between the member's HIV infection and the negligence of some defendant. Specifically, each class member must prove proximate cause. Here, again, this court's experience in the trial of *Poole v. Alpha* is invaluable.

■ There is no reason to think the proximate cause issue was more complex in the *Poole* trial than it would be in the cases of most of the putative class members here. The claim in *Poole* was that the decedent had

used the concentrates of each of the four defendant fractionators. Plaintiff sought to hold all of them liable on the theory that his infection could have resulted from, or have been exacerbated by, his use of each of the four products. Both sides offered expert testimony on the question of whether a patient who is infected with HIV can be further injured by a subsequent exposure to the virus. At the close of the evidence, the court found that plaintiff had failed to present evidence sufficient to create a jury question and instructed the jury that liability could not be based on a theory of "aggravation, acceleration, or 'reinfection.'" The alleged error in withdrawing that issue from the jury is one of the points raised in the pending appeal to the Seventh Circuit. The importance of the issue for present purposes is to illustrate how complex the matter of proximate cause can be. This court has no way of knowing whether in future trials plaintiffs may be able to create a jury issue regarding aggravation from multiple exposures to contaminated concentrates provided by different manufacturers. In any event, to recover against any defendant, a plaintiff must show that he used contaminated concentrate provided by that defendant. Where a plaintiff is able to show that he used only one fractionator's concentrate, the task is reduced to proving contamination. But in the case of a long-term hemophiliac like Stephen Poole, the likelihood of exclusive use of one brand of concentrate is small. The brands seem to be regarded as fungible by treating physicians, and a patient may receive a brand simply because it is the one the supplier had in stock at the time. When a hemophiliac is hospitalized, the hospital provides the brand it has on hand, which may be different from the brand the patient had been using at home. It seems likely, therefore, that most class members are in the position of Stephen Poole—they used more than one brand of concentrate during the time they could have been infected with the HIV virus. It would almost never be possible to demonstrate by direct evidence that the virus was transmitted by a

---

**5.** In *Poole v. Alpha* the strict liability counts were dismissed because of the Illinois Blood Liability Act, which bars any action against a blood product manufacturer or distributor based on strict liability or breach of warranty. *Poole v. Alpha Therapeutic Corp.,* 698 F.Supp. 1367, 1370–71 (N.D.Ill.1988) (Moran, J.).

particular infusion of concentrate. Nor is circumstantial evidence likely to supply the causative link. The normal circumstances are simply the infusion from a particular lot of concentrate and the subsequent appearance of the virus in the blood of the patient, perhaps years later, after many additional infusions from other lots of concentrate.

■ Various doctrines have evolved to afford a possibility of recovery to a plaintiff in this predicament. One is the "market share" doctrine, a burden-shifting device which permits a plaintiff unable to show which defendant's product caused his injury to recover against the defendants in proportion to their share in the market of the offending product. Another doctrine is "alternative liability," which, under certain circumstances, shifts the burden of proof on proximate cause to all defendants whose products could possibly have caused the injury. This is the theory adopted by this court in the *Poole* case, in the belief that this is the law of Illinois (a hotly disputed proposition, now moot because of the verdict in favor of defendants). *See Poole v. Alpha Therapeutic Corp.*, 696 F.Supp. 351, 354–56 (N.D.Ill.1988) (Moran, J.). But enough has been said to indicate that each of the many class members may be confronted with formidable problems, both factual and legal, in establishing whose negligence was a proximate cause of his HIV infection. The law in regard to proving proximate cause in a case of this kind is by no means uniform throughout the country. One jurisdiction might recognize the market share doctrine, another might recognize alternative liability, and a third might recognize neither, requiring instead that the plaintiff carry the burden of proving whose negligence in fact caused his injury. In some jurisdictions, the law on this subject is not settled.

On the proximate cause issue in the case against the fractionators, then, individual questions involving the particular circumstances of each plaintiff, and often the law peculiar to different jurisdictions, will clearly predominate. The only common question might be the issue of possible aggravation from multiple exposures.

■ In the case against the Foundation, proof of proximate cause will also involve a predominance of individual questions. Each class member will have to prove what acts or omissions of the Foundation he relied upon and how that reliance caused his HIV infection.

■ All of this does not mean that the question under Rule 23(b)(3) comes down to whether the common questions on negligence predominate over the individual questions on proximate cause, or vice versa. This is obvious from the second requirement of Rule 23(b)(3), "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." A class action involving both negligence and proximate cause could not be "superior" to any other method, simply because it is not feasible. It may be that other methods— individual trials of the numerous individual claims being the only one that occurs to the court—are equally impracticable, but that does not help the plaintiffs. There is no way a single jury in this case could comprehend and determine the proximate cause questions that would be presented by the claims of the hundreds (plaintiffs say thousands) of class members in this case.

The only conclusion the court can draw is that the requirements of Rule 23(b)(3) are not satisfied by the case as a whole, because the proximate cause issue is unmanageable on a class basis.

### Certification of Particular Issues

In view of the different conclusions the court has reached as to the negligence and proximate cause issues, the question naturally arises whether there is some way of carving out the common issues and treating them on a class basis. This brings us to a consideration of Rule 23(c)(4)(A), which provides that

> [w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues....

Plaintiffs argue that there are several areas suitable for certification under Rule 23(c)(4)(A). They see no problem with certifying the issues of negligence, strict liability, breach of implied warranty, and punitive

damages. Plaintiffs' only concession appears to be that proximate cause would be problematic.

For their part, defendants find insuperable obstacles to certification of any issue. They again rely most heavily on their argument that the differing law of fifty-one different jurisdictions would make a joint trial impossible.

The court's view is that the common negligence and breach of fiduciary duty issues can appropriately be certified but that the remaining issues suggested by plaintiffs do not qualify.

### Negligence and Breach of Fiduciary Duty

■ The arguments of the parties here are largely the same as those advanced in regard to the common issue question under Rule 23(a)(2) and (b)(3), *supra*, pp. 416–422. The court agrees with plaintiffs that there are common negligence issues that could practicably be tried in one action on a class basis. Defendants' argument that the law of each jurisdiction is different is, as indicated earlier in this opinion, not persuasive. Defendants' other major argument, that the products and procedures of each defendant were different, poses no obstacle to a jury determination of whether *each* defendant was negligent in any of the ways claimed by the plaintiffs. One of the verdict forms submitted to the jury in *Poole v. Alpha*, for instance, was as follows:

### SPECIAL VERDICT FORM A

We, the jury, find that before Stephen Poole was infected with the HIV virus the following defendant(s) was (were) negligent in the following ways charged by the plaintiff:

| | Alpha | Cutter | Armour | Baxter |
|---|---|---|---|---|
| Use of paid plasma donors—charge "a" | | | | |
| Failure to use surrogate testing—charge "b" | | | | |
| Failure to warn—charge "c" | | | | |
| Failure to adopt methods to inactivate viruses—charge "d" | | | | |
| Continued to market unpasteurized concentrates—charge "e" | | | | |
| Failure to screen out previously rejected donors—charge "f" | | | | |
| Failure to withdraw concentrate from the market—charge "g" | | | | |

The court recalls no argument by the defendants in the *Poole* trial that this form of verdict was unworkable or that the jury would not understand it. As it turned out, the jury did not complete that form but instead signed the alternative form finding that none of the defendants had been negligent in any of the ways claimed by plaintiff. Here again, however, the ability of the jury to make *that* determination illustrates the feasibility of trying the defendants jointly on common allegations of negligence. In *Poole*, it was done with one plaintiff and multiple defendants. The fact that the present case involves multiple plaintiffs would add no difficulty, inasmuch as the issue that would make a joint trial of the claims of multiple plaintiffs impracticable, proximate cause, would not be involved.

Defendants argue that because of the different negligence law in the various jurisdictions there could be no joint trial of the plaintiffs' negligence claims consistent with the defendants' right to due process. The claims of many of the class members arise only under the law of a particular jurisdic-

tion, usually the state of their residence, since this is where they would have used the factor concentrates of one or more of the defendants. This does not necessarily mean that the law of that state would govern the action, because there could be situations where the law of more than one jurisdiction might apply. Due process requires "'that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests such that choice of its law is neither arbitrary nor fundamentally unfair.'" *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818, 105 S.Ct. 2965, 2978, 86 L.Ed.2d 628 (1984) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13, 101 S.Ct. 633, 639–40, 66 L.Ed.2d 521 (1981)). In this case, if the substantive negligence law of the various states really were as diverse as defendants claim, there could be no joint trial of the negligence issue (just as there obviously could be no joint trial of the proximate cause issue, given the diversity of approaches to that question). However, because this court concludes that the definition of negligence is substantially the same throughout the country (albeit some jurisdictions would impose a duty of ordinary care and others a more lenient standard), it sees no danger of a due process violation.[6]

The real question under Rule 23(c)(4)(A) is whether a verdict finding each of the defendants guilty or not guilty of the various charges of negligence would be useful in the resolution of any of the individual damage claims of the class members. (These would be individual damage claims now pending or later brought in the appropriate jurisdictions.) That depends upon whether the negligence issues could be framed in a way that would make the verdict of the jury a suitable predicate for further proceedings under the negligence law of the particular jurisdiction under principles of collateral estoppel. *See generally Gray v. Lacke*, 885 F.2d 399, 406 (7th Cir.1989), *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Cohen v. Bucci*, 905 F.2d 1111, 1112–13 (7th

Cir.1990); *Falconer v. Meehan*, 804 F.2d 72, 75–76 (7th Cir.1986); *County of Cook v. Midcon Corp.*, 773 F.2d 892, 898–904 (7th Cir. 1985). There seems to be no reason the parties could not offer evidence relevant both to the questions of ordinary care and professional standard of care. The court has already indicated that it believes the ordinary negligence instructions given in *Poole v. Alpha* would be suitable for use in any other jurisdiction where ordinary negligence is the standard. It should be possible to draft instructions pertaining to the customary or professional standard of care in equally general terms, applicable to all jurisdictions where the defendants' duties would be measured by such a standard.

■ As far as the defendant Foundation is concerned, a verdict on the negligence and fiduciary duty allegations should be useable by or against the Foundation in any other jurisdiction where it might be made a defendant. It appears that the applicable negligence standard would be ordinary negligence, rather than a professional standard of care, but if that is not correct as to all jurisdictions, the jury could be instructed on both standards, just as in the case of the fractionator defendants.

The Foundation has not pointed out any likely differences in the law of the various jurisdictions as far as fiduciary obligations are concerned, and it appears that any jury verdict on those issues could also be given collateral effect.

In order for a verdict in this case to be of maximum use to the parties in collateral proceedings, the findings of the jury will have to take account of changes in scientific knowledge over the relevant period of time. Because there is no dispute that the fractionator defendants knew in the 1970s that their products could be contaminated with viruses and that heat kills viruses, plaintiffs' theory of negligence based on defendants' failure to heat treat their products even before the emergence of HIV is not especially time-dependent. But regarding plaintiffs' allega-

---

6. "We must first determine whether Kansas law conflicts in any material way with any other law which could apply. There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit." *Shutts*, 472 U.S. at 816, 105 S.Ct. at 2976.

tions that defendants negligently failed to recognize soon enough that the new virus was blood-borne and to take adequate precautions to prevent its transmission by their products, time is critical. To recover on a theory of negligence occurring after the virus had been identified, a plaintiff would obviously have to show he had used a concentrate distributed by the particular fractionator after that time. He would also have to show that the particular defendant had been guilty of some negligent act or omission in regard to the particular lot of concentrate which caused his infection. The later the date of infection, the more information the defendants had and the better chance the plaintiff would have to persuade the jury that by that time the defendant knew or should have known that its blood donors should have been screened, its product heat treated, and the public warned of the danger of HIV infection. As plaintiffs suggest, jury verdict forms could be drafted in a way that would permit the jury to find the earliest date by which each defendant knew or in the exercise of ordinary care should have known of the danger that its concentrates would transmit HIV. The verdict form could also call for a finding as to the earliest date by which each defendant knew or should have known that a particular precaution—e.g., donor screening, heat treatment, warnings—was necessary to protect the users of its product, a finding as to whether the defendant failed to take that precaution, and a finding as to the date after which the defendant was negligent in failing to take the particular precaution. And, of course, the form would permit the jury to make a finding as to each defendant that it was not negligent at all or that it was not negligent in particular respects alleged by plaintiffs.

A separate set of forms would be drafted for the "standard of professional care" inquiry. The jury would find, as to each allegation of negligence, whether the particular defendant had violated the standard of care and, if so, the date the violation began.

Verdict forms of this kind are not found in form books, and they will have to be prepared with great care if the verdict of the jury is to have the collateral utility contemplated in this opinion. The court is convinced that it can be done. The result would be the return of a verdict that would be useable for or against the defendants in jurisdictions throughout the country. If, for instance, a particular defendant were found not guilty of ordinary negligence and not to have violated any professional standard of care, that defendant would be absolved of any liability to any of the class members on a negligence theory. On the other hand, if a defendant is found to have been negligent in a particular respect after a particular date, that defendant would be subject to further prosecution by any class member who might attempt to prove that his HIV infection occurred as a result of using contaminated concentrate distributed by the defendant after that date. A class member who could not show he used the fractionator's concentrate after the "negligence date" would have no negligence claim against that fractionator based on acts or omissions occurring after that date. The various possibilities are obviously numerous, but enough has been said to demonstrate that certification of the negligence issues would be in the interest of judicial economy even though it is not feasible to certify the entire case as a class action.

The final question is whether certification of the negligence issue would, in the language of Rule 23(b)(3), be "superior to other available methods for the fair and efficient adjudication of the controversy." Defendants argue that the centralized discovery being conducted in the multidistrict litigation, followed by individual trials in the different jurisdictions when the cases are remanded at the completion of discovery, is a method of adjudication superior to Rule 23(c)(4)(A) certification of any particular issues. The court disagrees. It is true that, given the MDL proceeding, centralized discovery is going to occur whether or not there is any form of class certification. The relevant comparison is not between centralized discovery in the MDL and discovery in a class action, because there is no difference; this case is part of the MDL. The relevant comparison has to do with what happens *after* discovery. All defendants have to offer is a succession of separate trials in the various jurisdictions, litigating over and over again the same ques-

tions of what was known, when it was known, what should have been done, when it should have been done, and whether it would have worked in any event. These are the same issues that occupied 5½ weeks of a jury's time in *Poole v. Alpha*. Defendants want to do it repeatedly, before jury after jury, with the same witnesses monotonously repeating the testimony they have given many times before. (Defendants suggest that they would be willing to read the depositions of expert witnesses rather than having them testify live, but this takes almost as much time as having the witness appear live, and, in any event, the court is doubtful the parties would forego the presentation of live witnesses. In the *Poole* trial, most of the expert witnesses appeared live although their depositions had been taken and they had testified at previous trials.)

The court concludes that Rule 23(b)(4)(A) certification of the negligence and breach of fiduciary duty issues—specifically, whether the fractionator defendants were guilty of ordinary negligence or whether they violated any professional standard of care by doing or failing to do any of the things alleged by plaintiffs, and whether the defendant Foundation was guilty of negligence or breach of fiduciary duty—is appropriate and clearly superior to any other available method for the fair and efficient adjudication of those issues.

It is, of course, possible that for reasons the court does not presently foresee, the verdict of the jury would not be useable for collateral purposes in a particular case or perhaps even in a particular jurisdiction. But that would not detract from the efficiency of using the verdict in those cases and jurisdictions where it would be entitled to collateral effect.

### Strict Liability and Breach of Implied Warranty

If defendants are correct in their contention that strict liability and breach of warranty are precluded by the "blood shield" laws of all jurisdictions, they will be entitled to prevail on their motions to dismiss these claims. In fact, the court does not understand defendants' resistance to certification of these issues if they really believe they are entitled to dismissal. This is their chance to obtain a favorable judgment on these issues once and for all, precluding any individual claims by class members who do not opt out. The alternative is for the defendants to make these motions, probably filing identical briefs, in case after case throughout the country.

■ If, on the other hand, there are jurisdictions in which claims for strict liability and breach of warranty would lie, the court is not persuaded by plaintiffs' argument that these issues are closely enough related to the negligence question that they can efficiently be tried together. The problem lies in an area which neither side has addressed. Products can be negligently manufactured and yet be safe, merchantable and fit for the purpose intended. In this case, a particular vial of concentrate might escape HIV contamination for any number of reasons, regardless of whether it had been negligently manufactured. For example, the fractionator may have been negligent in failing to screen the blood donors for high-risk individuals, and yet the particular plasma pool may have had no infected donors. A vial of concentrate prepared from that plasma pool would not be contaminated and would therefore not breach any warranty of merchantability or fitness for a particular purpose and would not be unreasonably dangerous.

In short, the determination as to whether any of the defendants' products were unreasonably dangerous, or whether they breached any implied warranties, must be made on the basis of evidence relating specifically to the products which were used by each particular plaintiff and allegedly resulted in that plaintiff's infection. The determination is inseparable from the proximate cause issue: Unless a plaintiff can show (by whatever means is permitted by the law of the particular jurisdiction) that his infection was proximately caused by a particular defendant's product, he has not shown that product to be unfit, unmerchantable or unreasonably dangerous.

The court concludes, therefore, that individual issues predominate in the product liability and breach of warranty claims and that Rule 23(c)(4)(A) certification is inappropriate.

*Punitive Damages*

It appears to the court that unless a jury were to reach a decision as to whether a defendant's conduct caused actual damages, and, if so, the nature and extent of those damages, it is not in a position to make an informed decision as to the appropriateness of punitive damages. Because the issues the court will certify do not include proximate cause, the jury will make no determination of a causal connection between any conduct of a defendant and any injury to a plaintiff. While this court is of the view that repetitive assessments of punitive damages for the same course of conduct are undesirable, and that one assessment in a class action could be a superior method, this does not appear to be an appropriate case for that approach.

## CONCLUSION

Plaintiffs may prepare a proposed certification order and class notice in conformity with this opinion and serve copies on the defendants by August 29, 1994. The parties should attempt to resolve any disputes as to language, and a hearing will be held on September 13, 1994, at 2:00 p.m. for the purpose of finalizing the certification order and class notice.