**Bud McLAUGHLIN, Plaintiff–Appellee,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Defendant–Appellant.**

**No. 93–1428.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1993.

Decided July 26, 1994.

Rehearing Denied Sept. 8, 1994.

sive coverage, but to suspend all other coverage.

On October 13, 1990, the truck was totally destroyed by fire. Two days later, McLaughlin contacted his State Farm agent to report the incident and to file an insurance claim. At the time of the fire, the truck was being stored in an A-frame structure at a development known as Birdland in Roselawn, Indiana, where McLaughlin lived in a house trailer.

McLaughlin's State Farm agent reported the loss to the State Farm Claims Office, which assigned claims representative Brian Biery to gather the relevant facts and investigate the claim. Biery examined the file, arranged to take McLaughlin's statement, authorized a credit check, ordered appropriate reports, corresponded with McLaughlin, and assigned an estimator to inspect the damaged vehicle. Claims estimator Bill Siegfried inspected the truck, took photographs, and reported that the truck was a total loss.

After receiving this report, Biery contacted Herb Miller & Associates ("Miller"), fire and arson investigation experts, to obtain a cause and origin report on the fire and an investigation of a possible motive. Miller reported that the drive shaft, which was damaged and lay in pieces on the ground, had most likely exploded in the fire. Miller further reported that the fire was incendiary, that it started from inside the locked vehicle, and that there were no signs of forced entry.

During their first interview, McLaughlin informed Biery that on the day before the fire he had made arrangements to meet several of his friends for a deerhunting trip out of town. McLaughlin was to meet his first friend—Melvin "Sonny" Dobson—at Fish–A–While Lake, a "pay lake" stocked with fish open to the public where one pays a fee to fish on the lake. When McLaughlin arrived at Fish–A–While, he received a message that Dobson had been called into work for a few hours.[1] McLaughlin then decided to go to a local tavern—Pioneer II—to kill some time.

Gary Matthews (argued), Robert G. Vann, Enslen, Enslen & Matthews, Hammond, IN, for appellee.

Michael L. Muenich, Albert C. Hand (argued), Nancy Beggs, Michael S. Vass, Hand, Muenich & Wilk, Highland, IN, for appellant.

Before MANION and KANNE, Circuit Judges, and WILL, District Judge.[*]

WILL, District Judge.

In this case, we review a jury's award of compensatory and punitive damages in a breach of insurance contract case. In light of the Indiana Supreme Court's recent discussion of the Indiana punitive damages standards in *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515 (Ind.1993), and for the reasons articulated below, we reverse the jury's award of punitive damages.

## I.

### BACKGROUND

In February 1990, plaintiff Bud McLaughlin purchased a new International flatbed truck for a cash price of $28,950.00 plus financing. He made improvements to the truck totalling $13,692.00 so that it could be used in his business, which involved hauling fish for stocking lakes. Also, in February 1990, McLaughlin purchased from defendant State Farm Mutual Automobile Insurance Company ("State Farm") a policy on his new truck. In early October 1990, McLaughlin requested a suspension of insurance coverage since his truck would be in storage for the winter. After discussion with his State Farm agent, he decided to retain the comprehen-

---

[*] The Honorable Hubert L. Will, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

[1] Apparently, this statement was initially contradicted by Roger Clark, who claimed that McLaughlin never received a message from Dobson at Fish–A–While Lake. However, at trial

According to McLaughlin's original statement to Biery, Dobson met him at the bar at approximately 11:00 p.m., and they then travelled together to a restaurant at the intersection of Routes 10 and 41, where they were to meet another friend—Gene Perry. This restaurant was located approximately three miles from Birdland, where the truck was stored. When, according to McLaughlin's statement to Biery, Perry arrived at approximately 11:30 p.m., they all departed for the hunting site in Attica, Indiana.

At approximately 1:00 or 1:15 a.m., a county police officer discovered the fire at Birdland and alerted the fire department. McLaughlin, who was not informed of the fire, and the other gentlemen remained at the hunting site until mid-morning the next day. Perry and McLaughlin then drove back to Birdland so that Perry could fish on the pay lake and so that McLaughlin could travel to Fort Wayne to visit his son. Upon their arrival at Birdland around noon on October 13, 1990, McLaughlin was informed by a tenant who also lived on the Birdland property that his truck had burned during the night.

In the interview, McLaughlin also reported to Biery that he had the only set of keys to the locked vehicle at the time it burned. According to State Farm, he further informed Biery that he was behind on his truck payments and that he planned to obtain a loan from several relatives for the payments.

He also told Biery that several days before the fire he had forced three trespassers off the Birdland property and that the trespassers had threatened to get even with him. Apparently, McLaughlin speculated that the trespassers may have started the fire. McLaughlin said he had removed the battery from the truck before the fire because he was afraid that the trespassers might steal it.[2] Although McLaughlin told Biery that he met Perry at the truckstop at approximately

11:30 p.m., Perry at least initially told Biery that he worked until midnight and thus could not have met McLaughlin until at least 12:30 or 12:45 a.m.

McLaughlin was provided with an Affidavit of Vehicle Fire, which he completed and returned to State Farm on October 30, 1990. The affidavit stated that he was claiming a loss of $43,000.00 on the truck, that a balance of $25,866.74 remained due to Navistar Financial ("Navistar"), who financed the purchase of the truck. The total purchase price for the truck plus the special fish-hauling equipment on it was $44,089.50, of which approximately $20,397.50 was financed through Navistar.

McLaughlin also authorized State Farm to receive information concerning his finances. Biery requested Equifax, a credit investigation company, to conduct the necessary background and credit check. Biery was informed by Equifax that McLaughlin was in arrears for a total of $5121.00 on court-ordered support payments to his ex-wife. The credit check revealed that McLaughlin owed $516.00 to Gainer Bank for payments on a van, and that he had a $233.00 delinquency on a J.C. Penney charge card.

In January 1991, State Farm took a sworn statement from McLaughlin. In this sworn statement, McLaughlin denied having any outstanding credit card debt. He also led Biery to believe that he had several profitable contracts with the county for 1991 which would have generated significant income from the truck. Biery's investigation, however, revealed that when McLaughlin purchased the truck in February 1990, he had already missed the deadlines for bidding on these county contracts.

McLaughlin also stated during this interview that he had used his ex-wife's truck to haul fish on October 12, 1990 because his own truck was in storage.[3] McLaughlin informed Biery that the only footprints around the

---

Clark changed his statement and recalled that he did indeed deliver to McLaughlin the message from Dobson.

2. Apparently, McLaughlin informed the fire chief that he had removed the battery for a different reason: to store it during the winter.

3. During a later interview with Biery, McLaughlin's ex-wife initially denied that she lent her truck to McLaughlin on October 12, 1990; however, she later stated that she was unsure of the dates and could not remember whether he used her truck or his own.

truck after the fire were his own and the traffic he had permitted the previous day. It was during this interview that State Farm learned for the first time that McLaughlin had made two previous claims for fire losses.[4]

Following this sworn interview, Biery went personally to Birdland to inspect the accident scene. He there met Nick Yacuk, who informed him that he was in the process of repossessing McLaughlin's house trailer because McLaughlin was delinquent in making his required payments. Biery also discovered that the fire department actually received the fire alarm at 1:25 a.m., and arrived at the scene at 1:32 a.m. on October 13, 1990.

State Farm took additional recorded statements from Betty McLaughlin, the plaintiff's ex-wife; Dobson; Perry; Russell Neswick, the plaintiff's lawyer and the owner of Birdland; and Yacuk, who had sold the plaintiff the house trailer in which he resided at Birdland and was repossessing it. In Dobson's January 1991 sworn statement, he claimed that he met McLaughlin at 10:50 p.m. and that they met Perry at 11:30 or 11:40 p.m. on October 12, 1990; his earlier statement suggested that he met McLaughlin at 10:00 p.m., and that they met Perry at 11:00–12:00 p.m. His new statement claimed that they arrived at the hunting site at approximately 1:30 or 1:45 a.m. Biery apparently became suspicious because the times in the sworn statement conflicted with Dobson's earlier statements.

Shortly thereafter, Neswick informed State Farm that he was representing McLaughlin and that "we assume your company suspects Mr. McLaughlin of committing arson" and suggested a polygraph test. Although State Farm agreed to consider the results of such a test, it is unclear whether any such test was actually performed. State Farm continued to investigate the incident. Miller advised Biery that at the time of the fire the doors were closed and there was no evidence of a break-in.

The county fire department similarly advised Biery that there were no signs of a forced entry. The state fire marshall found the cause and origin of the fire to be liquid accelerant in the interior of the vehicle; his report similarly indicated that there was no vandalism or other sign of forced entry into the vehicle. All of these reports noted that the battery and radio had been removed from the vehicle prior to the fire.

On February 14, 1991, Biery issued a report which recommended that McLaughlin's claim be denied. His report was submitted to a claim review committee, which considered it and also recommended denial of the claim. The claim review committee forwarded the file and their recommendation to State Farm's corporate headquarters for review. State Farm's corporate headquarters agreed and, on February 26, 1991, forwarded to Biery the decision to deny the claim.

On the same day, Biery informed Neswick that the McLaughlin claim had been denied. He confirmed this decision in a letter which stated that the reasons for the denial were McLaughlin's "concealment ... misrepresentation ... and that the policy definition of a loss had not been met because the fire was not accidental in nature." Tr. at 1071–74. On March 14, 1991, however, State Farm sent Navistar a check to settle the lienholder's claim.

McLaughlin filed suit against State Farm in state court, seeking compensatory and punitive damages. Count I alleged that State Farm had breached the contract of insurance by failing to pay him the value of his truck and the special fish-hauling equipment which was destroyed in the October 13, 1990 fire. Count II alleged that State Farm's conduct in its handling and denial of McLaughlin's fire loss claim constituted fraud, malice, gross negligence, or oppression thereby entitling McLaughlin to recover punitive and/or exemplary damages. State Farm removed the action to federal court and both parties consented to trial before a magistrate judge.

State Farm filed a motion for partial summary judgment, seeking dismissal of the claim for punitive damages on the ground that there was no evidence to support a claim

---

4. In 1981, McLaughlin reported a 1977 van stolen, and it was later recovered burned. State Farm paid that claim. In 1981, McLaughlin was investigated by the fire department in connection with a fire at Fish–A–While Lake in a building which he was leasing at the time.

that State Farm's alleged breach of contract in denying the claim rose to the level of a tort. The motion was denied. Prior to the commencement of trial, State Farm moved to bifurcate the claim for compensatory damages from the claim for punitive damages primarily because of the potential prejudice from the evidence relating to punitive damages. This motion was also denied.

A jury trial was held from January 4 to 12, 1993. State Farm's motions for judgment on the evidence and directed verdict were denied. The jury returned a verdict in favor of McLaughlin, awarding compensatory damages of $26,592.00 and punitive damages of $150,000.00. State Farm now appeals from the jury's award of compensatory and punitive damages, and from the denial of its various motions.

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and we have jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291. While there is some dispute regarding the issues to be considered on appeal, they are best framed as follows:

A. Whether the district court erred in denying State Farm's motion for summary judgment;

B. Whether the jury was properly instructed on the issue of punitive damages;

C. Whether, under Indiana law, the evidence was sufficient to sustain the award of punitive damages; and

D. Whether the district court abused its discretion by denying State Farm's motion to bifurcate the issues of compensatory and punitive damages.

In light of the discussion below, we affirm the award of compensatory damages and reverse the award of punitive damages.

## II.

### DISCUSSION

A. *Summary Judgment Was Properly Denied*

State Farm argues on appeal that its motion for summary judgment on the issue of punitive damages was erroneously denied on the ground that the issue of State Farm's bad faith presented a triable question of fact. This Court reviews *de novo* a grant or denial of summary judgment. *Carston v. County of Cook,* 962 F.2d 749, 751 (7th Cir.1992); *Pro-Eco, Inc. v. Board of Comm'rs of Jay County, Ind.,* 956 F.2d 635, 637 (7th Cir.1992). It is well established that summary judgment is only appropriate where the court can determine that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ In reviewing a district court's decision to grant or deny summary judgment, this Court must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion. *Karazanos v. Navistar Intern. Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991) (citing *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990)). Additionally, where the substantive law mandates a "clear and convincing" standard of proof, as in this case, the court in disposing of a summary judgment motion must consider whether a reasonable factfinder could conclude that the plaintiff had sufficient evidence to meet that burden. *Anderson v. Liberty Lobby,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

On October 1, 1992, State Farm moved for summary judgment on the issue of punitive damages, arguing that its investigation of McLaughlin's claim was done in good faith and that punitive damages were thus unavailable. In his memorandum opposing summary judgment, the plaintiff argued that he was entitled to punitive damages because State Farm:

breached the contract of insurance with [McLaughlin], the breach was tortious in nature in that it caused undue economic harm to [McLaughlin] of which State Farm was aware at the time of the acts complained of herein, because State Farm acted in bad faith toward its insured in the claim handling, investigation and denial of [McLaughlin's] loss claim, because State Farm disregarded its own policy and claim-handling procedures, and because State Farm willfully and wantonly violated the duty imposed upon it by state law by

refusing to communicate with [McLaughlin] concerning the handling of his claim, the factual basis for its denial of his claim, and the factual basis upon which it raised policy defenses in order to deny [McLaughlin's] loss claim.

Pl.'s Mem. Opp'n Summ. J. at 1–2. In opposition to the motion for summary judgment, McLaughlin contended that the facts and inferences to be drawn from those facts not only showed bad faith on the part of State Farm, but also showed malice, gross negligence, and fraudulent or oppressive conduct.

In denying the motion for summary judgment, the district court found that "[a]lthough State Farm had some reasons to suspect that McLaughlin may have started the fire, whether State Farm's investigation was conducted in good faith is a question of fact for the jury." Br. of Appellant, Ex. B–3 at 5. On appeal, State Farm contends that bad faith alone is not sufficient to support a claim for punitive damages and that the motion should therefore have been granted. State Farm further argues that even if bad faith was enough to support the claim, no inference of bad faith could possibly be drawn because the district court concluded that the insurer had *"some* reason" to suspect arson by the insured.

The Indiana Supreme Court in two recent cases has clarified Indiana law regarding the recoverability of punitive damages in a breach of contract case. In *Miller Brewing Co. v. Best Beers of Bloomington, Inc.,* 608 N.E.2d 975, 984 (Ind.1993), the court held that "to recover punitive damages in a lawsuit founded upon breach of contract, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded." The Indiana Supreme Court explained:

Although the notion that punitive damages are available in contract actions where there is "tort-like" conduct has been cited in all cases of this Court which address the issue of punitive damages since *Vernon Fire* was decided, in fact, such an exception has never been applied by this Court. In fact, where punitive damages were affirmed in a breach of contract case,

this Court has found evidence of an independent tort.... After further consideration of *Vernon Fire* and the results in subsequent cases, we conclude that the language in *Vernon Fire* was *dicta* when it suggested that punitive damages are available in contract actions even if the plaintiff does not also establish each element of a recognized tort for which Indiana law would permit the recovery of punitive damages.... [S]uch a notion rests on an unwise policy.

*Id.* at 982–83.

*Best Beers,* however, did not involve an alleged breach of an insurance contract. But after *Best Beers* it appeared that only an independent tort, such as fraud or constructive fraud, would support a claim for punitive damages.

The Indiana Supreme Court, in a more recent decision, has specifically considered the requirements for punitive damages in an insurance contract case. In *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515 (Ind.1993), the court reviewed a decision by the Indiana Court of Appeals which had reversed a jury verdict awarding punitive damages to the plaintiffs. In the course of its opinion, the court discussed the Indiana history of punitive damages awards in breach of insurance contract cases.

■ After discussing *Vernon Fire & Casualty Ins. Co. v. Sharp,* 349 N.E.2d 173 (Ind.1976), and *Best Beers, supra,* the court in *Erie* first pointed out that *Best Beers* did not involve insurance. As a result, the decision did not address the question of whether under Indiana law a tort remedy is available to an insured when an insurer fails to fulfill duties imposed upon it by law and held that under Indiana law "recognition of a cause of action for tortious breach of an insurer's duty to deal with its insured in good faith is appropriate." 622 N.E.2d at 519. It concluded, however, that "a good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith. This is so even if it is

ultimately determined that the insurer breached the contract." *Id.* at 520.

■ With respect to punitive damages, the Indiana Supreme Court was very specific, saying "Punitive damages may be awarded only if there is clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, over-zealousness, mere negligence or other human failing, in the sum [that the jury believes] will serve to punish the defendant and to deter it and others from like conduct in the future.' " *Id.* (quoting *Brad Wolf Chevrolet, Inc. v. Robertson,* 519 N.E.2d 135, 137–38 (Ind.1988)). The court went on to say, "Thus, the mere finding by a preponderance of the evidence that the insurer committed the tort will not, standing alone, justify the imposition of punitive damages." *Id.*

After reviewing the evidence in *Erie,* the Indiana Supreme Court concluded that the jury could not reasonably have found by clear and convincing evidence that Erie, the insurer, had acted maliciously, fraudulently, oppressively or with gross negligence in denying the insured's claim. Accordingly, it affirmed the appellate court's reversal of the award of punitive damages to the plaintiff.

■ It is obvious from the foregoing that determination of whether an insurer has committed a tort in addition to breaching its contract, and whether its conduct was sufficiently egregious to warrant the imposition of punitive damages under Indiana law, involves both questions of fact and mixed questions of fact and law. It is also obvious that in this case there were substantial disputes about material facts and inferences to be drawn from circumstantial evidence. It follows, then, that the denial of State Farm's motion for summary judgment was not erroneous.

B. *The Jury Was Not Properly Instructed*

■ In a diversity case such as this, state law determines the proper jury instructions. *Simmons, Inc. v. Pinkerton's, Inc.,* 762 F.2d 591 (7th Cir.1985). As noted above, Indiana law requires that each of the elements of an independent tort plus egregious conduct involving malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, mere negligence or other human failing be proved by clear and convincing evidence in order for a jury to return a verdict of punitive damages.

■ "On review of a challenge to the sufficiency of the jury instructions, the question is not the correctness of a single phrase, but whether the instructions as a whole were sufficient to inform the jury correctly of the applicable law and the theory of defense." *United States v. Villarreal,* 977 F.2d 1077, 1079 (7th Cir.1992), *cert. denied,* ––– U.S. ––––, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993). *See also Doe v. Burnham,* 6 F.3d 476, 479 (7th Cir.1993). Thus, in reviewing a claim of error in the jury instructions, we must "look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." *Wilk v. American Medical Ass'n,* 719 F.2d 207, 218 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984). *See also Sims v. Mulcahy,* 902 F.2d 524, 533 (7th Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990) ("We look at jury instructions in the broad context of the entire trial including the court record, the court's rulings, the allegations set forth in the pleadings, the evidence presented at trial, as well as the opening and closing arguments of counsel.").

■ Moreover, an error in the jury instructions is reversible only if it affects substantial rights of the parties. *General Leaseways, Inc. v. National Truck Leasing Ass'n,* 830 F.2d 716, 725 (7th Cir.1987). *See also Goldman v. Fadell,* 844 F.2d 1297, 1302 (7th Cir.1988) (inadequacy of jury instructions is only reversible error when "the jury's comprehension of the issues is so misguided that a litigant is prejudiced"); *Vaughn v. Willis,* 853 F.2d 1372, 1376 (7th Cir.1988) (even if a jury instruction is found to be erroneous, "we will not find reversible error absent some effect on the substantial rights of the parties").

In this case, jury instructions 10, 14, 17, 20, and 24 through 28 related to punitive damages. Instruction 24 stated:

The plaintiff is not, however, entitled to punitive damages as a matter of right. Punitive damages are awarded in the discretion of the jury to punish a defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like him from committing such conduct in the future.

When a plaintiff seeks punitive damages, as opposed to compensatory damages, based upon the willful or wanton misconduct of a defendant, the plaintiff has the burden of proving these elements by clear and convincing evidence.

Instruction 25 stated:

Every insurance company doing business within the State of Indiana is required to act fairly and in good faith in handling claims submitted by an insured. This obligation of good faith requires an insurance company to give the insured's interest at least as much consideration as it gives its own. Punitive damages may be awarded where you find by clear and convincing evidence that the insurance company has acted in bad faith.

Bad faith, as used in the context of an insurance company, merely means a failure to be open, honest, and fair with the insured. The duty of good faith and fair dealing creates an obligation in the insurer not to deprive its insured of the benefits of the policy by withholding payment fraudulently, maliciously or without probable cause.

Instructions 24 and 25, particularly the latter, clearly do not correctly state Indiana law. Neither spells out the distinction between conduct which will sustain an award of punitive damages and that which will not. And Instruction 25 tells the jury that they may award punitive damages if they find that the insurance company "acted in bad faith." The Indiana cases, however, require that the jury find by clear and convincing evidence that the insurer acted maliciously, fraudulently, oppressively or with gross negligence, not merely in bad faith. As the First District Court of Appeals recently explained,

"[E]ven if the jury determines that the insurer committed a tortious breach of its duty to exercise good faith, the right of the insured to punitive damages is not automatic. Punitive damages may be awarded only if there is clear and convincing evidence that the insurer acted with malice, fraud, gross negligence, or oppressiveness which was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Nelson v. Jimison,* 634 N.E.2d 509, 512 (Ind.App.Ct.1994) (citing *Erie,* 622 N.E.2d 515).

Given the evidence in the case, that error was not harmless for it could easily have affected the jury's determination.

### C. *The Evidence Was Insufficient to Support Punitive Damages*

The evidence does not establish clearly and convincingly that State Farm here acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence or other human failing. On the contrary, the evidence indicates that State Farm was provided with information by its arson investigation expert that the fire was incendiary, started from inside the truck which was locked, the doors of the A-frame structure in which the truck was stored were locked, and there was no evidence of a break-in. McLaughlin stated that he had the only keys to the truck. The county fire department also reported that there were no signs of a forced entry and the state fire marshall who investigated the fire found it to have been caused by a liquid accelerant in the truck's interior. There was no evidence of vandalism or forced entry into the vehicle. All of the reports noted that both the radio and the battery had been removed from the truck prior to the fire.

State Farm's investigation also revealed that McLaughlin was in default in his installment payments on the truck, was in arrears a total of $5121.00 in court-ordered payments to his ex-wife, owed $516.00 in payments on a van, and $233.00 on a J.C. Penney charge card. State Farm also learned that the

house trailer in which he lived was being repossessed because he was in default in his payments on it.

McLaughlin denied the credit card debt and told the investigator that he had several profitable contracts with the county government for 1991. Investigation revealed that he had missed the deadlines for bidding on any 1991 county contracts and had none.

State Farm also learned that McLaughlin had made two previous claims for fire losses, one on a van he had reported stolen which was later recovered burned and another on a fire in a building he was leasing at Fish–A–While Lake. Finally, there were numerous discrepancies in the times McLaughlin, Dobson and Perry said they met, when they left various places, and when they arrived at the hunting site.

While State Farm was unable to establish that McLaughlin was responsible for the apparent arson since Dobson, Perry and McLaughlin himself all ultimately recollected they were together at the hunting site at the time the fire started, it cannot be said that the insurer's conduct in investigating and denying the claim was clearly malicious, fraudulent, oppressive or grossly negligent. Under Indiana law, therefore, the jury could not reasonably have awarded punitive damages. The jury could, on the other hand, have found that the denial of coverage was unreasonable and therefore tortious or, in any event, a breach of contract.

### D. *The Denial of State Farm's Motion to Bifurcate*

On December 29, 1992, only a few days before the trial was scheduled to begin, State Farm moved for a separate trial of the compensatory damages and punitive damages issues. This motion was denied. On appeal, State Farm argues that the court's denial of the motion was an abuse of discretion requiring reversal of the compensatory damages claim because it suffered prejudice. In short, State Farm argues that the jury in this case was unfairly prejudiced because it simultaneously heard evidence of State Farm's arson defense and McLaughlin's bad faith punitive damages claim which was based on State Farm's decision to raise an arson defense.

Under Rule 42(b) of the Federal Rules of Civil Procedure, a district court may order a separate trial of any separate issue "in furtherance of convenience or to avoid prejudice." Fed.R.Civ.P. 42(b). It is well established that the denial of a motion for a bifurcated trial should be set aside only upon a clear showing of abuse of discretion. *See, e.g., Conkling v. Turner,* 18 F.3d 1285, 1293 (5th Cir.1994); *Dixon v. CSX Transp., Inc.,* 990 F.2d 1440, 1443 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 305, 126 L.Ed.2d 252 (1993); *Eastridge Dev. Co. v. Halpert Assocs.,* 853 F.2d 772, 781 (10th Cir. 1988); *Gafford v. General Elec. Co.,* 997 F.2d 150, 171–72 (6th Cir.1993); *Barr Laboratories, Inc. v. Abbott Laboratories, Inc.,* 978 F.2d 98, 105 (3d Cir.1992); *Westergren v. Burlington N. R.R. Co.,* 969 F.2d 727, 729 (8th Cir.1992).

There is some possible risk of prejudice in the simultaneous presentation of a contract claim and a punitive damages claim arising from an insurer's decision to raise an arson defense on the contract claim. However, the risk of such prejudice in this case was slight. In denying State Farm's motion, the trial court stated:

First, the motion was filed on December 29th. It was not discussed at the pre-trial conference. The Plaintiff was not afforded an opportunity to respond to it prior to trial. If it was granted on the morning of trial, I believe it would unfairly prejudice the Plaintiff in the presentation of his case.

Also, substantively, I've handled at least a half a dozen cases against insurance companies such as this. Probably more. In all of those cases, the question of both actual and punitive damages has been submitted to the jury in one trial. I have not seen that there has been any prejudice either to the plaintiff or to the defendant insurance company in those cases. At least one has resulted in a plaintiff's verdict for compensatory damages alone. And at least one has resulted in a plaintiff's verdict for actual and compensatory damages. So I believe, based on past experience, the jury will be able to follow any

instructions and sort out the various issues.

Also, in a case such as this, there certainly is overlap between the evidence that relates to the compensatory claim and the punitive claim. In a personal injury case, if you bifurcate on the issue of liability and damages, the evidence could be packaged neatly. In a case like this with significant overlap, I do not believe that it would significantly improve the management of the trial; and any slight advantage that might accrue to the defendant would be outweighed by the added problems of attempting to sort out the evidence.

Br. of Appellant, Ex. B–5 at 1–2.

As the trial judge explained, since the evidence usually overlaps substantially, the normal procedure is to try compensatory and punitive damage claims together with appropriate instructions to make clear to the jury the difference in the clear and convincing evidence required for the award of punitive damages. While the instructions as to punitive damages were incorrect and the evidence insufficient to warrant them, the instructions with respect to compensatory damages were correct and the evidence sufficient to sustain them on either a breach of contract or tort basis. Moreover, State Farm has failed to demonstrate any prejudice.

Accordingly, we find that the district court did not abuse its discretion in denying the motion to bifurcate.

### III.

### CONCLUSION

The judgment for compensatory damages is affirmed. The judgment for punitive damages is reversed.

AFFIRMED IN PART, REVERSED IN PART.